FILED

2016 Aug-04  PM 02:56
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| EMERGENCY RESPONSE SPECIALISTS, INC., | ) ) ) | |
| Plaintiff/Counterclaim Defendant | ) ) | |
| vs. | ) ) | Case No. 2:14-cv-02214-WMA |
| CSA OCEAN SCIENCES, INC., | ) ) | |
| Defendant/Counterclaim Plaintiff | ) | |

## REPORT AND RECOMMENDATION

The above-entitled civil action was referred to the undersigned magistrate judge by Senior United States District William M. Acker, Jr., on the Motion to Compel Discovery Responses, Rule 37 Motion for Sanctions, Motion to Exclude Emergency Response Specialists, Inc.'s Expert Lisa Moore, and the Motion to Quash Subpoenas to Nobel Energy, Inc. and Nobel Energy Mediterranean, Ltd.[1] filed by CSA Ocean Sciences, Inc. (Docs. 55, 58, 61 & 62), and the Motion for Protective Order filed by Emergency Response Specialists, Inc. (Doc. 56). A hearing on the motions was held on July 29, 2016. Present were James T. Baxter, III, for Emergency Response Specialists, Inc. (ERS) and Kevin R. Garrison for CSA Ocean Sciences, Inc. (CSA). The court also heard extensive testimony from Lisa Moore, ERS's

---

[1] The correct spelling for these entities is Noble Energy and Noble Energy Mediterranean.

president and majority shareholder.  After consideration of the motions and responses of the parties, and the testimony of Ms. Moore and arguments of counsel at the hearing, the court rules as follows.

## I.    <u>Motion to Compel Discovery Responses (Doc. 55)</u>

CSA seeks an order compelling ERS to provide written, executed responses to CSA's interrogatories, and to produce certain documents responsive to CSA's requests for production of documents.

### A.  Executed responses

At the hearing, ERS requested an opportunity for Ms. Moore to review the unsigned interrogatory responses before signing them and providing a signed copy to CSA.  Executed interrogatory answers shall be provided to CSA within seven (7) days from the date of entry of this order, upon which it is RECOMMENDED that the motion to compel as to this issue be deemed MOOT.

### B.  Emails

Emails produced to CSA indicate that all were sent on February 6, 2014; however, the emails produced had been corrupted during a computer crash recovery. Therefore, CSA requests that the emails be produced in native format.  During the hearing, Ms. Moore testified that her work computer crashed and that she recovered the emails from the Entourage server using recovery software provided by Entourage.

She also provided a CD of the recovered emails to her former attorney.[2]  She testified that the recovery database of the emails is all that is available.  However, she stated that if one looks at the email threads, the actual dates of the emails and the names of the sender and recipient can be determined.  However, it appears that any attachments to the emails are no longer viewable.  CSA shall review the emails produced to it by ERS to determine if the emails can indeed be separated into chronological and time order, with recipient and sender identified, and promptly notify the court of any problems doing so.  To the extent any of the emails are between ERS and CSA, such that CSA already would have a copy, counsel for the parties shall exchange a list of such emails so as to avoid duplication.  Further, to the extent that Ms. Moore has any responsive emails, with their attachments, on her laptop, she shall produce copies of the emails with attachments, to CSA within fourteen (14) days from the date of entry of a final order on this report and recommendation.

### C.  Videos

CSA states that during the Rule 30(b)(6) deposition of ERS on April 6, 2016, it was revealed that certain photographs produced in response to CSA's request for production of documents were in fact videos.  CSA then requested the video files

---

[2] At a break during the hearing, Mr. Baxter contacted former counsel for ERS to determine if they had a copy of the native format emails.  However, former counsel represented that they have the emails only in the recovery format.

from ERS.  It is RECOMMENDED that the video files in question shall be provided to CSA within fourteen (14) days from the date of entry of a final order on this report and recommendation.

### D.  Text Messages

During the deposition of Carl Haywood on May 11, 2016, it was revealed that text messages responsive to CSA's requests for production are believed to be located on Carl Haywood's work cell phone.  However, while ERS has possession of the cell phone, it cannot access the text messages on the phone without obtaining the phone password from Mr. Haywood.  Counsel for ERS was instructed at the hearing to contact Mr. Haywood, through his counsel, Donna Smalley, to obtain the password. The text messages in question shall be provided to CSA within fourteen (14) days from the date of entry of a final order on this report and recommendation.  The Court ORDERS Mr. Haywood to cooperate in providing the password within the time frame set out in this order.  If Mr. Haywood refuses to cooperate, counsel for ERS shall inform the court, and the court will enter a further order compelling Mr. Haywood's cooperation.

## II.   <u>**Motion for Protective Order (Doc. 56)**</u>

ERS seeks an order quashing the deposition subpoena issued for Lisa Moore and served on May 19, 2016, noticing her deposition for May 25, 2016.  The motion was filed May 24, 2016.  Because the date of the deposition has passed and because

CSA deposed Ms. Moore on June 2, 2016, it is RECOMMENDED that the Motion for Protective Order be deemed MOOT.

### III.   Rule 37 Motion for Sanctions (Doc. 58)

CSA seeks sanctions pursuant to Rule 37, Fed.R.Civ.P., dismissing ERS's claims against it, or precluding Ms. Moore from testifying as an expert witness at trial and awarding CSA its fees and costs incurred for the May 25, 2016, deposition which Ms. Moore failed to attend.  CSA's deadline for disclosing its expert was June 2, 2016.  Ms. Moore's expert deposition previously was canceled three times on the eve of deposition, during the months of April and May; however, the dates for those depositions were not agreed upon in advance, nor was the May 25 date.  Ms. Moore was deposed as the 30(b)(6) representative of ERS on or about April 6, 2016. However, she declined to answer any questions at that deposition regarding her expert opinion.  Ms. Moore's expert report was filed on April 21, 2016, but the report is conclusory, and CSA's expert did not have the benefit of Ms. Moore's testimony prior to the deadline for its retained expert report, June 2, 2016.

At the hearing, Mr. Baxter stated that there were many back-and-forth communications about deposition dates, but it was difficult to accommodate the schedules of counsel for ERS and CSA, and Ms. Moore.  Mr. Baxter stated that the deposition notice for the May 25 expert deposition of Ms. Moore was served at his office, but he did not receive it right away because it was delivered to another

attorney in his office.  Mr. Baxter stated that he advised Mr. Garrison that Ms. Moore would not be available on May 25.  Mr. Baxter also filed the motion for protective order on May 24; however, no ruling on the motion was issued by May 25.  Ms. Moore testified at the hearing that she was scheduled to be in Jefferson County Circuit Court on May 25; however, this schedule conflict was not conveyed to counsel for CSA, and Mr. Baxter was unaware of the reason for the schedule conflict until the day of the hearing before the undersigned.  Ms. Moore did leave a voice mail for Mr. Garrison on May 25 to offer copies of requested videotapes, but Mr. Garrison did not return the call because she is represented by counsel.  Ms. Moore claims she was unaware she was supposed to be present for deposition on May 25, and she felt there was never a direct communication from Mr. Baxter or his office that she was due in Huntsville for a deposition on May 25.  Mr. Baxter stated he did talk with Ms. Moore about being deposed on May 25, but she advised him she could not get prepared to give an expert deposition by then.[3]  Mr. Baxter expressed surprise when he arrived at his office on May 25 to find a court reporter and videographer present for Ms. Moore's deposition.

Rule 37, Fed.R.Civ.P., provides that a court may order sanctions for failure to appear for a deposition.  Sanctions may include:

---

[3] It is noted that Ms. Moore had months to prepare for her individual deposition; therefore, her claim that she could not be prepared by May 25 rings hollow.

(i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

(ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

(iii) striking pleadings in whole or in part;

(iv) staying further proceedings until the order is obeyed;

(v) dismissing the action or proceeding in whole or in part;

(vi) rendering a default judgment against the disobedient party; . . .

Fed.R.Civ.P. 37(b)(2)(A)(i)-(vi).  The rule also provides, "[i]nstead of or in addition to these sanctions, the court must require the party failing to act, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust."  Fed.R.Civ.P. 37(d)(3).

Rule 37 permits the court to impose sanctions upon a party or its attorney or both and establishes no preference between these options.  The apportionment of fault between an attorney and client is the court's responsibility.  *Devaney v. Cont'l Am. Ins. Co.*, 989 F.2d 1154, 1160 (11th Cir. 1993).  "A motion for sanctions under Rule 37, even one which names only a party, places both that party and its attorney on notice that the court may assess sanctions against either or both unless they provide the court with a substantial justification for their conduct."  *Id.*   There is no

requirement that the court find bad faith in an attorney's or party's actions before imposing sanctions. *Id.* at 1162. "In narrowly defined circumstances federal courts have inherent power to assess attorney's fees against counsel." *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 765 (1980).

Mr. Garrison stated at the hearing that CSA paid $173.50 for the court reporter, $340.00 for the videographer, and $109.00 for his mileage to and from Huntsville. He also stated he expended five hours at a rate of $320 per hour.[4] The court notes that Mr. Garrison is a shareholder in Baker, Donelson, Bearman, Caldwell & Berkowitz and has been admitted to practice since 2007.

Given the circumstances and the obvious mis-communication between Mr. Garrison, Mr. Baxter and Ms. Moore, the undersigned finds that the drastic sanction of dismissal of ERS's complaint is not warranted. Dismissal is a sanction of last

---

[4] Mr. Baxter took issue with the claimed hourly rate and stated $225 to $275 per hour would be a more accurate rate for attorneys practicing in Huntsville. However, this action was filed in the Southern Division of the Northern District of Alabama, and the rate charged by attorneys in Birmingham is the relevant rate. "A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." *Norman v. Housing Auth. of City of Montgomery*, 836 F.2d 1292, 1299 (11th Cir. 1988). "The general rule is that the relevant market for purposes of determining the reasonable hourly rate for an attorney's services is the place where the case is filed." *American Civil Liberties Union of Georgia v. Barnes*, 168 F.3d 423, 437 (11th Cir. 1999) (citation and internal quotation marks omitted); *see also Cullens v. Georgia Dep't of Transp.*, 29 F.3d 1489, 1494 (11th Cir. 1994) ("The rate of attorney's fees is that of the place where the case is filed."). The court may utilize its own "knowledge and expertise" to come to an independent judgment regarding the reasonableness of requested attorney's fees. *Loranger v. Stierheim*, 10 F.3d 776, 781 (11th Cir. 1994).

resort, applicable only in extreme circumstances, and appropriate only when less drastic sanctions would be ineffective. *McKelvey v. AT&T Technologies, Inc.*, 789 F.2d 1518, 1520 (11th Cir. 1986); *State Exchange Bank v. Hartline*, 693 F.2d 1350, 1352 (11th Cir. 1982); *Martin-Trigona v. Morris*, 627 F.2d 680, 682 (5th Cir. 1980). ERS did seek a protective order regarding the deposition on May 24, but the court did not issue a ruling before May 25.  Mr. Baxter did offer to schedule Ms. Moore's deposition between May 25 and June 2, even on the Memorial Day weekend; however, it is unclear when he offered this compromise.  ERS did not file any motion to extend the discovery or expert disclosure deadline to allow Ms. Moore to be deposed after May 25.  Despite having a deposition noticed for May 25, Mr. Baxter did not affirmatively advise his client that she had to attend, and Ms. Moore never advised him that she had to be in court in Jefferson County on that day.  The only excuse she offered to Mr. Baxter was that she could not be prepared in time to be deposed on May 25.

The language of Rule 37(d)(3) states that the court "must" award fees and costs, unless the failure to attend the deposition was "substantially justified or other circumstances make an award of expenses unjust."  The undersigned finds that the exceptions to the mandatory nature of the fee and cost award are not present, and that Mr. Baxter and Ms. Moore are equally to blame for her failure to appear on May 25. Therefore, it is RECOMMENDED that CSA's Motion for Sanctions be GRANTED,

and that CSA be AWARDED attorney's fees in the amount of $1600.00 and costs in the amount of $622.50, jointly and severally against Mr. Baxter and ERS.

## IV.   Motion to Exclude Emergency Response Specialists, Inc.'s Expert Lisa Moore (Doc. 61)

The decision on this motion is guided by *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and Federal Rule of Evidence 702.

Federal Rule of Evidence 702 lays out the circumstances in which expert testimony is admissible:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702.

A trial court, in determining the admissibility of expert testimony under Rule 702, must conduct "a rigorous three-part inquiry," considering whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting *City of Tuscaloosa v. Harcros Chems., Inc.,* 158 F.3d 548, 562 (11th Cir. 1998)).   The *Daubert* gate-keeping requirement applies to both scientific and experience-based expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

The proponent of the expert testimony carries a substantial burden under Rule 702.  "The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence."  *Allison v. McGhan Med. Corp*., 184 F.3d 1300, 1306 (11th Cir. 1999) (citing *Daubert*, 509 U.S. at 592 n.10, 113 S.Ct. at 2796 n.10). Thus, the proponent must demonstrate that the witness is qualified to testify competently, that his opinions are based on sound methodology, and that his testimony will be helpful to the trier of fact.  *See, e.g., Frazier*, 387 F.3d at 1260 ("The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion. . . ."); *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002).

Expert testimony that does not assist the trier of fact can be excluded under *Daubert*.  509 U.S. at 591, 113 S.Ct. at 2795-96; *see also Hibiscus Assoc. Ltd. v. Board of Trustees of Policemen & Firemen Ret. Sys. of Detroit*, 50 F.3d 908, 917 (11th Cir. 1995) (citing *Salem v. U.S. Lines Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119,

1122, 8 L.Ed.2d 313 (1962)) ("Expert testimony is properly excluded when it is not needed to clarify facts and issues of common understanding which jurors are able to comprehend for themselves.").

Ms. Moore has a Bachelor of Science degree in chemistry from the University of South Alabama, with a minor in biology. She also has taken courses over a four-year period toward a Ph.D. in environmental science and toxicology at the University of Alabama at Birmingham. Although she does not have a degree in oceanography, Ms. Moore testified that she has taken courses in the ocean sciences. In addition, she has extensive certifications and training in the area of hazardous waste operations and emergency response and substantial experience in that field. (*See* Doc. 76-1 at 8-13, Lisa Moore Curriculum Vitae). Additionally, Ms. Moore has authored conference abstracts on Isobaric Collection of Discrete Phase Samples from Deepwater Oil/Gas Seeps, Key Factors in Obtaining Representative Samples of Subsurface Oil/Gas Plumes in Deep Sea Releases, and Deepwater Oil/Gas Plume Sampling: Thermodynamic Properties Key to Accurate Sampling. (*Id*. at 12).

In 1989, she started Emergency Response Specialists, Inc. The company was designed to respond to emergencies involving hazardous materials to ameliorate the danger these materials present.

Most of Ms. Moore's experience in emergency response to hazardous wastes was with regard to surface materials. Prior to 2010, she had no experience with deep

water sampling.  In 2010, however, she was hired to participate in the collection of samples   from the plume of the Deep Water Horizon oil well blowout in the Gulf of Mexico.  A metal cylinder was used to take samples at a depth of 5200 feet.  The device used operated as intended and took volume samples and held the pressure at depth without a problem.  Ms. Moore's job included doing some analysis onboard ship with regard to methane concentration in the plume.

In 2011, with regard to this project she designed a smaller volume, higher pressure sampling device with a safety release.  However, for various reasons, these samplers were not used.

Moore was later hired to perform water testing in a brine pool at the Leviathan-2 (Lev-2) site in the Mediterranean Sea.  It was her intent to use the cylinders she designed for this testing.  Although she had no previous experience with a brine pool, Ms. Moore testified that she studied them by reading about them and looking at videos of deep water brine pools taken by organizations such as the Woods Hole Oceanographic Institution.[5]

Ms. Moore testified that her company was hired to take deep water samples from a depth of approximately 5100 feet in the east Mediterranean Sea by CSA.  She

---

[5] According to Ms. Moore, a brine pool is a pool that forms in relation to an underwater salt formation which, because of its density and lack of currents, stays in a pool underneath the water. She testified that a brine pool can be artificially created by underwater drilling.

stated that she was advised that she was expected to determine whether and what type of methane might be present at a capped oil well at that location. She testified that she was told that she would take samples from a brine pool located just above the well cap.

Ms. Moore further testified that, when she got to the Lev-2 site, she observed that the pool over the well cap appeared to be more viscous in nature than brine pools that she had seen. Furthermore, it appeared to contain a substance of very fine, light solid material not consistent with sediment that stayed suspended in the viscous solution. She also observed a sample taken from the ocean floor in the area she was supposed to take samples and she noted that it had an acrid, chemical odor.

Unsure of what substances might be in the solution, Moore sent an email requesting an inventory of the chemicals that had been used to cap the well. What she received was a list of 3.3 million pounds of various chemical substances that had been pumped into the well. She was advised that these chemicals "could" still be on the bottom of the ocean at this site. She noted that there were a number of chemicals that caused her concern. For example, she noted that there was a chemical compound known as Starside, which she stated would, over time, decompose into nitrous oxide and sulphur dioxide. Moore stated that, at that time, she was not sure what would happen if she brought some of these chemicals to the surface, either instantaneously, such as a result from the reduction in pressure, or over a period of time, from the

Page 14 of 23

increased temperature on the surface.  She testified that she needed time to research these facts, but was not allowed to do so.

In addition, she testified that she was led to believe that she would be able to do some testing of samples on-board ship, only to learn when she arrived, that all samples would have to be sent to a university in Israel for testing.  Furthermore, she was not provided with proper equipment to keep the items cold, as they were at 5100 feet, during transport and that transport could take many hours by boat to the shore and then by taxi to the university.  Ms. Moore testified that she also not have necessary protective gear or equipment to clean up any hazardous material leaks.

Moore also testified that she was concerned that chemicals that were used to cap the well would get into the sampling containers and would block the pressure safety release mechanisms, potentially causing an explosion when the items reached the reduced pressure of the surface or after warming up during their transport to the university for testing.

CSA has moved to exclude the proposed opinion testimony of Ms. Moore. CSA asserts that the opinions of Moore should be excluded because they are not based on reliable facts or data, are not the product of reliable principles or methods, and do not result in the application of such principles of reliability to the facts of this case.  One reason given by CSA is that Moore has virtually no experience in conducting pressure-stable, deep-water sampling procedures.  However, as set out

below, this objection goes more to the foundation for Moore's testimony than it does to her qualifications to testify concerning the dangers presented by performing deep-water sampling at this site.

First, it is interesting to note that, while CSA claims that Moore has "virtually no experience in conducting pressure-stable, deep-water sampling procedures," this is precisely what CSA hired her to do.  Thus, CSA is alleging that Moore has no experience in properly conducting the activity that CSA itself hired her to perform. Apparently, Moore had sufficient expertise when she was hired to perform this testing, but lost her expertise when she failed to do the testing because she believed the conditions might be too dangerous to do so safely and wanted to do further research into this before proceeding.

Moore's expert report is conclusory in nature and does not provide a basis for her conclusions.  The report is, indeed, very conclusory.  However, Moore is not an expert retained solely to give testimony in this case.  She is the president and majority shareholder of ERS and is providing testimony in her own defense.  Rule 26(a)(2), Fed.R.Civ.P., distinguishes between retained and non-retained experts.  Ms. Moore is not an expert witness retained or specially employed to provide expert testimony. Thus, she is an expert who must be disclosed under Rule 26(a)(2), but she is not required to provide an expert report. *See* Fed.R.Civ.P. 26 Advisory Committee Notes, 1993 Amendments, subdivision (a), para. (2) ("The requirement of a written report

in paragraph (2)(B), however, applies only to those experts who are retained or specially employed to provide such testimony in the case. . . .  A treating physician, for example, can be deposed or called to testify at trial without any requirement for a written report."). Consequently, the fact that her report is merely conclusory is not a basis for excluding her testimony.  The report itself, of course, is not admissible, but her testimony may be.

In this case, CSA asserts that Moore's lack of experience in conducting pressure-stable, deep-water sampling procedures disqualifies her from testifying. However, the basis of her testimony does not relate as much to the principles of deep-water sampling as it does to basic scientific principles and basic laws of chemistry.

It is clear, based on her education and experience, that Ms. Moore is qualified to testify with regard to chemical reactions and the effects of temperature and pressure on chemical elements and compounds.  This is basic Chemistry 101. Likewise, she holds the patent on the deep-water sampling device that was to be used in the Lev-2 brine pool testing and is clearly qualified to testify about how it works. Consequently, her testimony regarding her concerns for the safety of the procedures she was asked to undertake are based on her knowledge of chemistry and the sampling device itself.  Any further knowledge of deep-water testing procedures is unnecessary.  Her concern was with what would happen if unknown or potentially dangerous chemicals were lifted from 5100 feet to the drastically reduced pressure

of the surface and transported for a period of several hours without sufficient cooling or the ability to monitor the device holding the samples for dangerous pressure levels or chemical reactions.

Under these circumstances, ERS has demonstrated that Ms. Moore is qualified to testify competently as to these issues, that her opinions are based on sound methodology, and that her testimony will be helpful to the trier of fact. *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 563 (11th Cir. 1998) (citing *Daubert*, 509 U.S. at 589, 113 S.Ct. at 2794). A district court's gatekeeper role under *Daubert* "is not intended to supplant the adversary system or the role of the jury." *Allison v. McGhan*, 184 F.3d 1300, 1311 (11th Cir. 1999). "'Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking [debatable] but admissible evidence.'" *Id.* (quoting *Daubert*, 509 U.S. at 596, 113 S.Ct. at 2786). Consequently, CSA's objections are a basis for cross-examination of Moore, but not for the exclusion of her testimony. Therefore, it is RECOMMENDED that CSA's motion to exclude the expert testimony of Ms. Moore be DENIED.

## V.   Motion to Quash Subpoenas to Noble Energy, Inc. and Noble Energy Mediterranean, Ltd. (Doc. 62)

CSA seeks an order quashing a Rule 45 subpoena sent by ERS to Noble Energy, Inc. and Noble Energy Mediterranean, Ltd. The subpoena was issued on

Thursday, June 9, 2016, three days before the deadline for completion of all discovery on June 12, 2016.  The subpoena commanded Noble Energy, Inc. and Noble Energy Mediterranean, Ltd. to produce documents by June 28, 2016, after the discovery cutoff.  CSA asserts that the subpoena is an end-run around the discovery cutoff, and many of the documents sought could have been requested from CSA during the discovery period.  Further, Noble Energy, Inc. and Noble Energy Mediterranean, Ltd. served objections to the subpoenas based on the subpoenas being served on June 14, 2016, over breadth, undue burden, invalid place of compliance,[6] insufficient time to comply, confidential or proprietary information, attorney-client privilege and work product protection, international discovery issues, and invalid service of Noble Energy Mediterranean by service of the subpoena on Noble Energy (an entity separate from Noble Energy Mediterranean).

A Rule 45 subpoena is subject to any discovery deadlines.  *See Abrams v. Ciba Specialty Chems. Corp.*, 265 F.R.D. 585, 588-89 (S.D.Ala. 2010).  A party cannot use a Rule 45 subpoena "as a means to engage in discovery after the discovery deadline has passed."  *Pushko v. Klebener*, 2007 WL 2671263, at *3 (M.D.Fla. Sept. 7, 2007).

---

[6] The subpoenas were issued by this court, served on Noble Energy and Noble Energy Mediterranean in Houston, Texas, and commanded production in Huntsville, Alabama.  Counsel for ERS stated he would allow production in Houston and he would determine how to get the documents to Huntsville.  Noble Energy and Noble Energy Mediterranean state that many of the documents responsive to the subpoena are maintained in Israel or on wells located in the Mediterranean Sea.

If a party fails to comply with the discovery deadline, its subpoena is untimely and is due to be quashed. *See McDonald v. Cotton States Mut. Ins. Co.*, 2015 WL 1138026, at *6 (M.D.Ala. Mar. 13, 2015) (quashing subpoena served one week after the discovery deadline); *Dees v. Hyundai Motor Mfg. Ala., LLC*, 2008 WL 821061, at *1 (M.D.Ala. Mar. 25, 2008) (quashing subpoena served after the discovery deadline). A subpoena is untimely even when a party issues the subpoena prior to the discovery deadline if the party uses the subpoena to make an end-run around the discovery deadline. *See Marvin Lumber & Cedar Co. v. PPG Indus., Inc.*, 177 F.R.D. 443, 445 (D.Minn. 1997) (prohibiting the defendant from serving, or enforcing, a subpoena with a return date after the discovery deadline). Mr. Baxter, counsel for ERS, candidly admitted that he appeared late in the proceedings

Rule 45(c)(2)(A), Fed.R.Civ.P., states "[a] subpoena may command . . . production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person. . . ." Rule 45(d)(3)(A) states "[o]n timely motion, the court for the district where compliance is required must quash or modify a subpoena that: (i) fails to allow a reasonable time to comply; (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c); (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or (iv) subjects a person to undue burden." A court also may quash or modify a subpoena if it

requires "disclosing a trade secret or other confidential research, development, or commercial information."  Fed.R.Civ.P. 45(d)(3)(B)(i).

In this case, it is clear that the subpoenas to Noble Energy and Noble Energy Mediterranean are due to be quashed on several bases.  First, the subpoenas were issued too late to allow compliance before the discovery deadline.  Second, they were issued in the Northern District of Alabama but commanded production in Houston, which clearly is more than 100 miles from the boundaries of the Northern District of Alabama.  Third, any subpoena to Noble Energy Mediterranean was not validly served on Noble Energy.[7]  Fourth, the subpoena is overly broad in scope.  While ERS offered at the hearing to narrow the scope of the subpoena to documents reflecting the composition of the brine pool around the Leviathan 2 wellhead, the other reasons for quashing the subpoenas make such an offer of no consequence.  Accordingly, it is RECOMMENDED that the Motion to Quash Subpoenas to Noble Energy, Inc. and Noble Energy Mediterranean, Ltd. be GRANTED.

---

[7] Noble Energy Mediterranean is a subsidiary of Noble Energy, located in the Cayman Islands.  Generally, service on a parent company is not effective service on a subsidiary; the parent-subsidiary corporate relationship alone is not ordinarily enough to establish agency for the purpose of service.  *See Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333, 336-37, 45 S.Ct. 250, 251-52, 69 L.Ed. 634 (1925).  The party seeking to prove proper service must at least show that the parent corporation exercises such control and domination over the subsidiary that it operates merely as a department of the parent corporation.  *Bank of America Corp. v. Edwards*, 881 So.2d 403 (Ala. 2003); *see In re Curenton*, 205 B.R. 967 (Bankr. M.D.Ala. 1995).  ERS has made no such showing.

### NOTICE OF RIGHT TO OBJECT

Any party who objects to the findings and conclusions contained in this report and recommendation must, within fourteen (14) days of the date on which it is entered, file specific written objections with the clerk of this court. Any objections to the failure of the magistrate judge to address any contention raised in the petition also must be included. Failure to do so will bar any later challenge or review of the factual findings of the magistrate judge, except for plain error. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, (1985), *reh'g denied*, 474 U.S. 1111 (1986); *Dupree v. Warden*, 715 F.3d 1295, 1300 (11th Cir. 2013).

To challenge the findings of the magistrate judge, a party must file with the clerk of the court written objections which shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection. The filing of objections is not a proper vehicle through which to make new allegations or present additional evidence. Furthermore, it is not necessary for a party to repeat legal arguments in objections. A copy of the objections must be served upon all other parties to the action.

On receipt of objections meeting the specificity requirement set out above, a United States District Judge shall make a *de novo* determination of those portions of the report, proposed findings, or recommendation to which objection is made and may accept, reject, or modify in whole or in part, the findings or recommendations made

by the magistrate judge.  The district judge, however, need conduct a hearing only in his discretion or if required by law, and may consider the record developed before the magistrate judge, making his own determination on the basis of that record.  The district judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.  Objections not meeting the foregoing specificity requirement will not be considered by a district judge.

A party may not appeal a magistrate judge's recommendation directly to the United States Court of Appeals for the Eleventh Circuit.  Appeals may be made only from a final judgment entered by or at the direction of a district judge.

DONE this 4th day of August, 2016.

HARWELL G. DAVIS, III
UNITED STATES MAGISTRATE JUDGE